# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-1486

_____

Diamond D. Blair

*Plaintiff - Appellant*

v.

Michael Bowersox, Warden

*Defendant*

Roger Terry, Deputy Assistant Warden

*Defendant - Appellee*

John Doe 1, SCCC Correctional Officer I; John Doe 2, SCCC Correctional Officer
I; Jane Doe 1, SCCC Correctional Officer I; Jane Doe 2, SCCC Correctional
Officer I

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: February 12, 2019
Filed: July 12, 2019

_____

Before SMITH, Chief Judge, BENTON and STRAS, Circuit Judges.

_____

SMITH, Chief Judge.

Inmate Diamond Blair was attacked by a fellow inmate on the first day he arrived at South Central Correctional Center (SCCC) in Licking, Missouri. Following the attack, prison officials placed Blair in a single-man cell in the facility's administrative segregation unit ("Ad-Seg") while they conducted an investigation. Officials returned Blair to the prison's general population after two months in Ad-Seg. Two days later, he was attacked again, this time by a different inmate. Blair brought suit under 42 U.S.C. § 1983 against Deputy Warden Roger Terry, alleging a failure to protect him from harm by fellow inmates. The case was tried to a jury. After the parties rested, Terry moved for judgment as a matter of law. The district court[1] granted Terry's motion. Blair challenges the court's ruling on appeal. We affirm.

## I. *Background*

Diamond Blair brought a failure-to-protect claim against Deputy Warden Roger Terry. Blair alleged Terry acted with deliberate indifference to the substantial risk that Blair would be attacked by a fellow inmate, in violation of the Eighth Amendment's protection against cruel and unusual punishment. A jury trial was held, and at the close of all the evidence, the district court granted judgment for Terry as a matter of law. The district court determined that no reasonable jury could find in Blair's favor.

We review the district court's decision de novo. *Spruce v. Sargent*, 149 F.3d 783, 785 (8th Cir. 1998). Our analysis requires "that (1) all direct factual conflicts must be resolved in favor of [Blair]; (2) all facts in support of [Blair] that the evidence tended to prove must be assumed; and (3) [Blair] must be given the benefit of all reasonable inferences." *Id*. We will affirm the decision if the evidence, viewed

---

[1]The Honorable Roseann Ketchmark, United States District Judge for the Western District of Missouri.

under these standards, would not permit a reasonable jury to come to a different conclusion. *Id.*

Blair is an inmate serving a life sentence within the Missouri Department of Corrections (MDOC). He arrived at the SCCC facility on April 7, 2015, where he was assigned to a general population housing unit. That evening, as Blair sat down in the dining hall for dinner, a fellow inmate whom he knew approached him and put his arm around his shoulder. Blair shrugged him off. Moments later, another inmate, Qusai Mahasin, attacked Blair from behind, stabbing him multiple times with a prison-made knife. Blair had never met or had any contact with Mahasin before the attack, and he did not know why Mahasin attacked him.

The attack occurred in the prison's general population unit. In addition to general population, SCCC also contains protective custody and Ad-Seg housing units. The prison places inmates in protective custody when there is reason to believe that their safety would be jeopardized in general population. Inmates in protective custody still receive the same general privileges afforded to the general population inmates. Inmates housed in Ad-Seg, however, receive severely limited recreational privileges, fewer opportunities to leave their single-man cells, and shorter meal times. Inmates commonly refer to Ad-Seg as "the hole." Following the attack, Blair was treated in the infirmary, issued a conduct violation for fighting, and temporarily placed in an Ad-Seg housing unit while prison officials conducted an investigation into the incident. Officials also placed a transfer hold on Blair so that he would not be transferred to another facility before they could conclude the investigation.

As a deputy warden at SCCC, Terry handled "offender management." This responsibility included supervising the prison's custody and classification staff and approving inmate housing recommendations. On April 13, several days after the attack, Terry went to the Ad-Seg housing unit to speak with another inmate. While he was there, he approached Blair at his cell. Blair asked Terry why he was being kept

in Ad-Seg despite being the victim of an attack. Terry replied that, as far as he was aware, the investigation was still ongoing, so he could not "do anything with [Blair]" at that time, but he "would check on it" for him. Trial Tr., Day 3, at 433, *Blair v. Bowersox et al.*, No. 6:15-cv-03532 (W.D. Mo. April 16, 2018), ECF No. 247.

Blair testified that he asked Terry to send him to a protective custody unit because he believed that someone had a "hit" out on him. Trial Tr., Day 1, at 54, *Blair v. Bowersox et al.*, No. 6:15-cv-03532 (W.D. Mo. April 16, 2018), ECF No. 245. When Terry asked him why he thought so, Blair replied:

> I told him I felt at the time or believed at that time it had something to do with my murder case, the case—the case that I'm doing time for. I believe that some of my—I believe that my victim had some relatives at that institution. And that was maybe the reason why I was stabbed because I didn't know why I was stabbed. I just got there.

*Id*. According to Blair, Terry said he was going to leave him in Ad-Seg until he could "figure out what to do with" him because he "was too aggressive" to be placed in the protective custody unit. *Id*. When Blair protested, Terry advised him, "you're not going to PC. Get that out of your head." *Id*. Terry also told him that a facility transfer was not an option, so Blair believed that "the only recourse was to keep [him] in Ad-Seg or go back to general population." *Id*. at 57. Another offender in the housing unit, Carl Johnson, testified that he heard Terry say to Blair, "I'm not letting you out of here," and "PC's not an option." Trial Tr., Day 2, at 257, *Blair v. Bowersox et al.*, No. 6:15-cv-03532 (W.D. Mo. April 16, 2018), ECF No. 246. Johnson did not hear Blair ask Terry for protective custody, but he heard Terry tell Blair he was "just too aggressive for" the PC unit. *Id*. at 258.

In an effort to get out of the Ad-Seg unit, Blair wrote a letter to Eric Schafer, the MDOC Investigator assigned to his case. In the letter, he expressed his frustration with being confined to Ad-Seg and receiving a conduct violation despite being an

-4-

assault victim. He questioned why he was being "punished," especially in light of available surveillance video of the attack and the fact that "the assailant was locked up immediately, as well." J.A., Vol. II, at 68. The letter concludes: "I would like to be released back to general population. I do not want/need protective custody. Thank you." *Id*. Blair testified that he wrote this because he believed the more he requested protective custody, the longer he would be left in Ad-Seg. He believed his only option outside of Ad-Seg was general population.

Two days later, prison officials conducted a classification hearing to review Blair's housing assignment. Blair testified that he told the Ad-Seg committee he believed he had a hit out on him, and he requested a transfer to another institution. He said he told the committee about his conversation with Terry and his understanding that protective custody was not an option. The committee asked Blair if he needed protective custody, and he said no. He testified that he declined because "if you ask again for PC, you know you're going to be in the hole longer." Trial Tr., Day 1, at 75. An offender's statement at a classification hearing is generally recorded or summarized by one of the committee members on a classification hearing form. Blair's testimony about the statement he gave to the committee did not appear on the corresponding form. Instead, a committee member checked a box indicating Blair did not need protective custody, and the form does not show that Blair had made any requests for protective custody in the days preceding the hearing.

The form also indicates Blair had been placed in disciplinary segregation, which is more punitive than administrative segregation, due to the fighting conduct violation he received on April 7. Blair would remain in disciplinary segregation until April 23, and remain housed in the Ad-Seg unit until another review scheduled for the following month. Blair signed the classification hearing form as well as a "Protective Custody Needs Assessment/Waiver" indicating "I do not feel that I need protective custody. I am not aware of any enemies among the inmate population, and do not believe I am in any danger." J.A., Vol. II, at 70. Blair testified that he waived

-5-

protective custody status because he knew Terry would be the one approving the form.

Also on April 23, Blair filed an Informal Resolution Request (IRR) form. The IRR is the first step in SCCC's grievance system. Blair's IRR requested an expungement of the conduct violation he had received following the assault "and that [he] be immediately reassigned to general population." J.A., Vol. III, at 666. A case manager reviewed his complaint and recommended the dismissal and expungement of the conduct violation on May 13, 2015. That same day, the Ad-Seg committee reviewed Blair's housing assignment. Blair testified that he again made a statement to the committee requesting placement in general population if protective custody was not an option. However, the summary of his statement on the classification hearing form reads: "Just wondering what my status is going to be. I don't need P.C." J.A., Vol. II, at 71. The committee checked the "No" box next to "P.C. Needs" and recommended continued assignment to Ad-Seg with another review in 90 days. *Id.* Again, Blair signed a form waiving protective custody.

Immediately following the May 13 hearing, Blair filed another IRR form challenging his continued confinement in Ad-Seg. On the form under the heading, "Action Requested: State Remedies You Are Seeking," Blair wrote, "Released to general population or, in the alternative, agreement to forgo further grievance procedures as redundant, and petition the court(s) for immediate decision for relief." *Id.* at 74.

On May 27, 2015, MDOC Investigator Schafer interviewed Blair as part of the investigation into the April 7 attack. The interview was audio-recorded and played for the jury. In the recording, Blair reiterated that he did not know why he was attacked. Schafer concluded the interview by asking Blair if there was anything he would like to add, to which Blair replied, "I don't need PC if that's, you know, if that's the issue. I don't need PC." J.A., Vol. III, at 752. Blair's testimony at trial

explained his answer to Schafer as necessitated by his April 13 conversation with Terry, in which Terry said that protective custody was unavailable. According to Blair, he only represented that he did not need protective custody because he believed he could not get it and wanted to remove its consideration as a possible hindrance to his getting released from Ad-Seg.

Blair testified that he wrote Terry three or four letters in April and May requesting protective custody or, in the alternative, a transfer. These letters are not in the case record. After receiving no response to his letters, Blair wrote another letter on June 1 to SCCC Warden Michael Bowersox. In it, Blair wrote, "If I cannot be released to general population, please transfer me" to another facility. *Id*. at 750. On June 2, Schafer sent Warden Bowersox a letter stating that Blair's transfer hold was no longer necessary for investigative purposes and that SCCC officials "should determine if the offender needs placement/continued placement in administrative segregation." *Id*. at 731. Schafer testified that he released the transfer hold after his May 27 interview with Blair. Terry testified that he received a copy of Schafer's letter.

Warden Bowersox put a post-it note on Schafer's letter asking Terry, "what are we going to do with [Blair][?]" Trial Tr., Day 3, at 446. Terry then spoke to the warden, who told him that Blair's family had been calling and that Blair had been writing letters. Terry testified that he told Warden Bowersox that "Blair is a victim"; "if there's nothing else on the investigation and we know that . . . we got [Mahasin] locked up," and Blair "doesn't want protective custody, I don't care . . . . if [Blair] goes to general population." *Id*. at 444–45. He advised the warden to hold a special review hearing because he "didn't see the point in [Blair] having to sit in a single cell solitary confinement for another month or two when he was a victim." *Id*. at 476. The warden agreed, and Terry ordered the review.

On the morning of June 5, prison officials approached Blair's cell and asked whether he was "ready to get out of the hole" and if he was "tired of complaining" about being in Ad-Seg. Trial Tr., Day 2, at 204. Blair testified he did not receive a formal classification hearing, but the officials did consult him about his placement preference. In contrast to the other classification hearing forms in the record, the form reporting the June 5 hearing was not signed by any classification committee members or by a deputy warden. Terry testified that Blair could not have been released to general population without a signed classification hearing form or a signed protective custody waiver. Blair testified that he does not recall signing a protective custody waiver before his release to general population on June 5, and there is no such waiver form in the evidentiary record.

On June 7, just two days after Blair's return to general population, he suffered a second attack, this time from a different inmate. The attack severely injured Blair. On June 9, Schafer attempted to interview Mahasin, Blair's first attacker. Mahasin refused to speak or offer a written statement. That day, Schafer issued his report regarding the April 7 attack. Schafer's report was inconclusive and left the cause of the attack on Blair as undetermined. The report did not determine whether someone had ordered the first attack.

## II. *Discussion*

On appeal, Blair argues that the district court erred in granting judgment as a matter of law to Terry. Blair claims that Terry's approval of his return to general population amounted to a failure to protect him from the second attack. To succeed on his claim, Blair must be able to prove two elements: (1) that Terry knew there existed an objective, substantial risk of serious harm to Blair in the prison's general population housing unit; and (2) that Terry was deliberately indifferent to that risk. *See Letterman v. Does*, 789 F.3d 856, 861–62 (8th Cir. 2015).

The deliberate indifference element is subjective and has two components. *Id.* at 862. First, Blair "must . . . demonstrate that [Terry] knew of the substantial risk of serious harm to [Blair]." *Id.* Blair does not have to prove that Terry had actual knowledge of the risk of harm; he can instead demonstrate that the risk was obvious enough to support the inference that Terry knew the risk existed. *Id.* However, "constructive knowledge, or the 'should-have-known' standard, is not sufficient to support a finding of deliberate indifference." *Spruce*, 149 F.3d at 786 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The hurdle is higher: Blair must instead show that Terry "had been exposed to information concerning the risk and thus 'must have known' about it." *Letterman*, 789 F.3d at 862 (quoting *Farmer*, 511 U.S. at 842).

Second, he must prove that Terry "deliberately disregarded that risk" by showing that Terry "knew that [his] conduct was inappropriate in light of the risk." *Id.* (internal quotation omitted). The subjective standard is akin to that of criminal recklessness: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" before acting—or failing to act—with a conscious disregard for the risk. *Farmer*, 511 U.S. at 837. "In contrast to negligence, deliberate indifference requires a highly culpable state of mind approaching actual intent." *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017) (internal quotation omitted). We measure the official's state of mind according to his knowledge at the time of the incident, without the benefit of hindsight. *Id.*

Blair asserts that a jury could reasonably conclude that Terry acted with deliberate indifference for three reasons. First, Blair testified to telling Terry that someone had a hit out on him during their April 13 talk. Second, circumstantial evidence showed Terry had not received an investigation report for the first attack when he released Blair. Third, Blair did not request protective custody in his letters

and on the assessment forms because he believed protective custody would not be given and the request would delay his release from Ad-Seg even further.

Blair's reasons and the record evidence do not support reversal of the district court's judgment as a matter of law. Even if Blair had voiced his concerns to Terry about there being a hit out on him, there is no evidence Blair knew who ordered it or who Blair's enemies in general population may have been. A prison official does not necessarily act with deliberate indifference by failing to place an inmate "in protective custody based on his general fear for his safety." *Robinson v. Cavanaugh*, 20 F.3d 892, 895 (8th Cir. 1994) (per curiam). We have previously considered similar facts in *Davis v. Scott*, 94 F.3d 444 (8th Cir. 1996), where an inmate was injured shortly after entering a facility's general population. The inmate in *Davis* was housed in protective custody because of the presence of known enemies in the prison's general population. *Id*. at 445. After his known enemies left the facility, prison officials held a housing classification hearing for him. *Id*. at 446. The inmate asked for continued protective custody because he feared that friends of his departed enemies who remained in general population might try to harm him there, though he could not provide names for any such "would-be attackers." *Id*. at 447. We held that the prison officials did not act with deliberate indifference in releasing him to general population because his statements were "vague and unsubstantiated" and did not constitute "solid evidence . . . of an identifiable serious risk to [his] safety." *Id*.

Blair's statements to Terry were speculative and non-specific. Blair's stated suspicions are insufficient to show Terry knew of a specific risk to Blair in a return to general population. Mahasin's apparently unprovoked April 7 attack was never connected to anyone else. Blair's theory of the existence of a hit being placed on him had no evidentiary support beyond his suspicions. "[N]either unsupported conjecture nor negligence regarding a substantial risk of serious harm . . . is sufficient to prove deliberate indifference." *Lenz v. Wade*, 490 F.3d 991, 996 (8th Cir. 2007) (citing *Farmer*, 511 U.S. at 835).

-10-

Blair notes that officials had not yet interviewed his attacker or completed the investigation of the first attack at the time Terry approved his return to general population. But Terry knew that Blair's April 7 attacker was not in general population and was separately secured. Mahasin did not personally pose a direct threat to Blair in the general population unit. There was no proof that any other inmate posed an immediate threat to Blair.

Releasing Blair without knowing the first attacker's motive could have, at most, constituted negligence. But "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. We agree with the district court that the evidence cannot establish Terry acted with deliberate indifference and that Terry is entitled to judgment as a matter of law.

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____